# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
SLY MAGAZINE, LLC,

           Plaintiff,

    - against -

WEIDER PUBLICATIONS L.L.C. and
AMERICAN MEDIA, INC.,

           Defendants.
-------------------------------------------------X

**DECLARATION OF RUBY CHARLES**

Civil Action No.: 05 CV 3940 (RCC)

**RUBY CHARLES** hereby declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am the chief officer and a general member of SLY MAGAZINE LLC which was started on or about May of 2004.

2. For approximately 1 year before we organized as an LLC, we had been preparing for our World Wide Web launch of our magazine.

3. On June 30, 2003, we purchased the SLY MAGAZINE domain name. A copy of the "Who is" data showing our June 30, 2003 creation of the SLY MAGAZINE domain is annexed as Exhibit. A.

4. Before selecting a name for the publication we had carefully planned the formation of our company and the magazine. Copies of some of our meeting minutes from 2002 are annexed as Exhibit B.

5. Following the selection of the name SLY in 2003, we began sourcing manufacturers and printers while working on the design, layout and story lines for the magazine. Annexed as Exhibits C and D are early production estimates. The SLY mark was selected to identify our design and story ideas.

6. In January of 2004, photo shoots for SLY were held at Grand Central Station. See Exhibit E.

7. A March 2004 mock up for SLY is annexed as Exhibit F.

8. A June 2004 mock up is annexed as Exhibit G.

9. By May of 2004, the company had been formally organized. See Exhibit H. A company meeting was held on May 15, 2004. See Exhibit I. Invoices for production, photography, designing, and creation of SLY in early 2004 are annexed as Exhibit J.

10. On November 1, 2004, the online magazine launched, and a party was held on November 4, 2004 at the Coral Room in New York City. A print out of the invitation sent out by ENFLYER an internet campaign circulation company is annexed as Exhibit K.

11. When we discovered that defendants were preparing to launch a Men's magazine with the same SLY name, we sought legal advice and on January 12, 2005, well before the defendants' magazine was even sent to printers, we sent a cease and desist letter to defendants, so that they knew they would be infringing upon our SLY trademark if they offered their SLY magazine for sale. A copy of the letter is attached to our complaint as Exhibit 3.

12. Over a month later, defendants began selling their infringing magazine in a

conscious decision to infringe upon our trademark.

13. A copy of each of the cover pages of our magazine and the defendants' magazine are annexed as Exhibits 1 and 2 of our complaint. Copies of some of our magazine issues are annexed as Exhibit L.

14. Today, upon telephoning the defendants' sales offices, I was advised that the defendants' had produced a Winter SLY magazine which is slated to be shipped to newsstands any day now. The dissemination of this magazine will cripple the remaining identity that our trademark has with respect to our product. The damage will be irreversible insofar as the public, upon seeing the defendants' SLY magazine in newsstands will further associate the SLY mark with a male oriented magazine completely diluting the image and quality our trademark as a source identifier for the magazine we market which is further described in Exhibits M, N and O hereto.

15. There have already been numerous instances of actual confusion where the public associates our SLY trademark with the defendants' magazine. Some actual confusion is annexed as Exhibit P.

16. Confusion is devastating to a small company like ours, because the customer base and market that we target to be attracted to our product, will upon seeing the SLY mark, associate the magazine with a different product, obviously skewing their viewing and purchasing decisions.

17. It is for this reason that we come to this honorable court on an emergency basis and respectfully urge the Court to immediately restrain the distribution of the infringing magazine until a preliminary injunction hearing can be held.

18. If the distribution of the magazine is not frozen, then by the time the hearing is held (even if it is next week) it is very likely that the defendants' magazine will already be at newstands across the country making enforcement of the injunction costly and less adequate.

WHEREFORE, I respectfully ask that this honorable court issue a TRO and a Preliminary Injunction.

Dated: New York, New York
December 9, 2005

_____
RUBY CHARLES