# EXHIBIT 20

Page 50

WETZEL

Q. Who knows that?
A. Mr. Crocetti.
Q. Now, would the profit be determined by calculating what you paid AMI for the magazines -- withdrawn.
    Would the profit be calculated by determining how much of the monies you collected you turned over to the Defendants?
A. No.
Q. How is it determined?
A. The amount of payment to --
Q. The amount you collected?
A. No, the amount of payment to the publisher.
Q. Meaning the Defendants?
A. Yes, less our fee for that service.
Q. Well, you testified earlier that you collected a certain amount of money and then out of the money you collected there was an agreement that indicated how much you would turn over --
A. We did not collect as a line item for AMI. Our statement is a combination of all publications billed to a wholesaler for a particular month and all credit transactions

Page 51

WETZEL

coming back. So, all cash remitted to Curtis is commingled. It's not identified as a certain amount for this publisher, a certain amount for that publisher. We decide what the remit would be to the publisher.
Q. You're trying to tell me that you can't figure out how much profit you made off of Sly Magazine?
A. Sure we can figure it out.
Q. How?
A. We would look at the value of the sales less whatever our fee is -- which is based upon the value of the sales -- and that would be our profit.
Q. When did your company first become aware of this lawsuit?
A. I don't know.
Q. Was it before or after January 2005?
A. I don't know.
Q. When was the first conversation you ever had with anyone concerning my client?
A. Two, three weeks ago.
Q. Does Curtis have any policy in place to check on the trademarks of magazines that you

Page 52

WETZEL

distributed?
A. No. We rely on the publisher's assertion that they have the right to trademarks or any copyrights pertaining to the product that we distribute for them.
Q. Is this philosophy that you just mentioned written down anywhere?
A. Yes, in the contract between Curtis and the publisher.
Q. Is there such a contract that has that language with the Defendants in this case?
A. I wouldn't know specifically.
Q. In relation to Sly Magazine?
A. I would not know specifically. I'm not privy to that specific contract.
Q. What contract are you referring to that you testified about what it contains?
A. A general contract that we have with most of our publishers.
Q. When was the last time you saw such a contract?
A. Maybe a year ago.
Q. Where did you see it?
A. I think I reviewed it with a

Page 53

WETZEL

potential publisher, client.
Q. Why did you do that?
A. Because we were soliciting their business.
Q. What publisher did you review it with?
A. It was a potential publisher. They were in Canada. I'm trying to think of their name.
Q. Is there somebody from your company whose regular job it is to review such contracts with publishers or potential publishers?
A. Yes, Mr. Porti.
Q. Who signs these contracts on behalf of your company?
A. Generally, Mr. Porti or Mr. Castardi.
Q. Can a retailer purchase directly from your company?
A. In very limited circumstances.
Q. Why is that?
A. Because our business is through wholesale distributors.
Q. Primarily?
A. Primarily.

14 (Pages 50 to 53)

Page 70

WETZEL

Q. How much before?
A. Generally, two to three weeks.
Q. But you're not sure with respect to this?
A. No.
Q. What is the date of the Sly Magazine referred to in Document 17?
A. July/August '05.
Q. That's the on-sale date and, again, you do not know the cover date?
A. No, it's -- the issue is July/August '05.
Q. I was just trying to expedite.
So, on this one you do know the cover date?
A. Yes, it's listed as the cover date.
Q. What's the on-sale date?
A. 7/25/05, off-sale 9/5/05.
Q. On-sale July 25th, off-sale September 5th; is that correct?
A. Correct.
Q. How much money did you pay the Defendants for that issue?
A. Approximately, $22,000.

Page 71

WETZEL

Q. Now, on the first page on the upper right-hand corner, the very first dollar amount, it says $639,000 and change. What number does that represent?
A. That's the gross balance due without adjustment for returns.
Q. So, is it your testimony that after adjusting for returns, the gross balance due was the 22,000 figure you referred to earlier?
A. Correct.
Q. Was an audit done with respect to that issue?
A. No.
Q. How do you know?
A. Because we do not routinely audit this particular transaction.
Q. But do you know whether or not an audit was done?
A. No, I do not.
   MR. BOSTANY: Mark this 18, please.
   (Whereupon, the aforementioned eight-paged statement was marked as Plaintiff's Exhibit 18 for identification as of this date by the Reporter.)

Page 72

WETZEL

Q. Looking at what has been marked as Exhibit 18, sir, what is the cover date of that issue of Sly Magazine that your company distributed?
A. This refers to it as Sly #2.
Q. And the date?
A. 05011, on-sale 5/9/05, off-sale 7/11/05.
Q. So, on-sale May 9th, off-sale July 11th; is that correct?
A. Correct.
Q. The cover date, if you know?
A. There was no cover date.
Q. How much did your company pay the Defendants for that magazine, that issue?
A. Approximately, $22,000.
Q. What was the initial draw, the amount?
A. 867,000.
Q. So, all but -- what did you say, 19,000?
A. 22,000, approximately.
Q. All but the 22,000 were returned?
A. Correct.

Page 73

WETZEL

Q. Was an audit done to confirm those returns?
A. Not that I am aware of.
Q. Would you necessarily become aware of it?
A. No.
Q. Now, I'm going to show you these four documents, 15, 16, 17, and 18, sir, and ask you if these represent all four magazines that your company ever distributed with the title "Sly"?
A. Yes.
Q. Now, focusing on Exhibit 16 -- I'm sorry, 15, what's the date of that document?
A. The date is 1/23/06.
Q. That refers to a magazine, a Sly Magazine that goes off-sale when?
A. 3/26/06.
Q. March 26th?
A. Uh-huh. Yes.
Q. So, has that document been updated since January 23rd, you said?
A. What's today's date?
   MS. SULLIVAN: The 23rd of February.
A. It could be in the process of being

19 (Pages 70 to 73)